The Judges of the United States Court of Appeals for the Fourth Circuit. Mr. Hatch. Good morning, Your Honors, and may it please the Court, Ben Hatch on behalf of Floor Federal Solutions. The foundation of contract is the rule of mutual agreement, and the pillar that is built on top of that foundation is that when the parties have expressed their mutual agreement in a written and integrated contract, that contract is their agreement. The District Court got this case wrong, and its ruling threatens that foundation and that pillar because it went beyond the plain text of the parties' agreement. As the District Court acknowledged, there is no explicit limit on the amount of recoverable G&A or general and administrative expenses or other costs in the text of the subcontract, and that's a JA-598. Within the four corners of the parties' written and undisputable agreement, Floor clearly wins. It's a cost reimbursement contract. It allows reimbursement for all direct and indirect costs under the FAR provisions and within the scope of the contract. So how did we get here? Is this a standard problem in the course of government contracting? Does this kind of issue arise as to what G&A recovery is allowed? I mean, is this unique to this contract or a great many government contracts, but not government contracts, but contracts between general and subcontractors drafted in this manner? Your Honor, it's not a general problem in the sense that, as an overarching matter, you typically get your reimbursement, as the FAR provides, for your direct and indirect costs, of which there's no dispute G&A is one. Are you representing that normally there aren't any caps? Well, let me be clear. A cap would be an exception rather than a rule? There's different types of contracts, Judge Wilkinson, and you see that come up in this record. For example, there's something called a firm fixed price contract. This isn't a firm fixed price contract, but if you had a firm fixed price contract, you're not going to ultimately bill for your cost because the government is just paying or the prime contractor is just paying that firm fixed price. What I'm saying, and I think both sides agree on this, and this was the evidence at trial, that under a cost reimbursement contract, which is what we have here, there is reimbursement for costs unless the parties agree to a specific cap. And you can agree. Obviously, this is contract, so you can agree to what you want to agree to. Of course, they say you had to agree to the cap to get the contract. That's what they say. I find that very interesting because, of course, they say that this was a key term of this contract under PAE's position, and yet this key term that they claim they secured in these negotiations is indisputably nowhere found in the four corners of this contract. It would be so easy to have said after if they are right that there was mutual agreement on this term, which there wasn't, you would just put it into the contract except for a cap 2.3% on G&A. That's nowhere in the contract. And, in fact, we know that the parties knew how to express a limit because in the contract there's this table in A1 of the contract, and the table has estimated costs, and estimated I would submit to you is the exact opposite of fixed or cap, but estimated cost and then a not to exceed contract value column. And that, we agree, is a limit on the full amount of our recovery, and we nowhere seek to exceed that through this litigation. And so it would be quite odd if the parties clearly knowing how to express in that table in A1 a limit on the amount that FLOR could secure under this contract had also intended another limit and yet never expressed it. Well, given that PAE has refused to pay anything above the 2.3% cap since 2004, why wait until 2016 to bring suit? Yes, Your Honor. And this is another key part of the government contracting rule. That seems to me to be a problem. Like you might even have limitations. I know the district court didn't go there. And I don't think you were the lawyer in front of the district court. Is that right? I was not, Your Honor. Well, there you go. So explain to me why your client kept on being limited by the 2.3% cap. Let me answer that in two parts, if I will. The first part, why it's not a problem that this dispute didn't arise for some years. This is a key part of government contracting. There's two concepts here. There's the provisional rate that you bill your costs at, including something like G&A costs. And then there's the actual audited rate. And the provisional rate, when you're doing this for FLOR, you're performing under a given year, you don't know what your ultimate costs are going to be at the end of that year. And so you bill at a provisional rate, all understanding, and this is all laid out in the FAR provisions that are incorporated in the contract, but understanding that ultimately later the government will audit your costs and tell you what your actual rates were. And then, again, unless the parties agree to a cap, you get those actual costs. And so what was happening for these many years, as you identified, Judge Motz, was that we were billing at a provisional rate as we performed. What's strange, and I'm not particularly in the government contracting space myself, I didn't handle below, but what I've learned is that the government takes a long time to conduct these audits. So it's your representation to us that it took the government that long, between 2004 to 2016, to put you on notice of this problem? Well, the audit didn't come out until I think 2015, Your Honor, for all those years. And you didn't know before that, that you were only picking – how big a corporation is this? A floor? Yeah. It's a substantial corporation, Your Honor. And was this a picky young contract that they had? This contract didn't make much difference to them? No, Your Honor, this is an important contract. And they didn't know for all those years that they weren't getting paid what they were supposed to be paid? Well, they certainly knew, Judge Motz, that they were not getting paid provisionally at the rate that they expected to recover actually. So let me make sure I understand this. You're saying that they accepted the 2.3% cap provisionally while they were awaiting the federal audit? No, Your Honor, let me be clear. Floor, in no respect, accepted a 2.3% cap. You were paid in pursuant to the 2.3% cap for all those years? There was an ongoing dispute. We billed provisionally at a higher rate, actually, but all that PAE ultimately paid was 2.3% for years. This was an ongoing dispute. But you didn't object? Did you object at that time when you only got the 2.3%? Yes, Your Honor. In every single year? There was multiple times when the parties, and this is laid out, and this is all post-contractual, but the parties had an ongoing dispute. I don't think anybody would disagree about this rate. There were meetings about it, and the way it ultimately got resolved, essentially, was we ended up continuing to provisionally bill at a higher rate. They only paid at the lower rate, but, of course, we're expecting to get our actual costs when it's audited by the government. And to just close out the loop on my answer to Judge Mott's, it's not like the government, as I understand it, But you were awaiting the federal audit in order to get what was due you? Correct. That's how these work, Your Honor. You bill provisionally, and then ultimately when the government You bill according to your contract, and you said the contract provided you more. You don't just bill provisionally the amount that the other side wants to pay you. You have assertedly come to a contract. I mean, you say that there was no contract for this 2.3% cap, but that's what the other side says they're billing pursuant to that contract. Well, we're certainly billing pursuant to the contract, but we weren't locked into any kind of 2.3% rate. That's all you were receiving? Provisionally. But this claim, and this gets back to Judge Mott's, I want to answer your point about statute of limitations. As we lay out in the brief, I don't really think that's before this court ultimately. It was never decided by the district court. There's disputed factual findings, but I'm not sure. It's not in front of us. I mean, we can decide. It's a legal question, right? They have briefed it. Yeah. What they briefed was their legal theory, but the district court at summary judgment determined that there were disputed issues of fact. I think it was summary judgment. There was a bench trial. Yes. Right, Your Honor. It's a trial of the court. It's like a jury verdict. But it declined to give summary judgment earlier on, on the statute of limitations grounds. That's right. It declined. But what's up here is a bench trial. That's correct. A verdict. That's correct. But the district court, of course, on a bench trial, the court needs to make factual findings and conclusions of law that this court reviews. And at summary judgment, the district court said there are multiple disputed issues of fact in denying PAE's motion for summary judgment. But we should conclude that there no longer are. And never reached any findings on the statute, as I read the opinion. It certainly never ruled on the statute. It ruled that we had failed in our affirmative case for breach of contract, and so it never reached the statute of limitations. But in any event, even if this court does. So the claim that you accepted the 2.3% for however many years you accepted it, it sounds like, it sounds in waiver, that you sort of waived, either that you waived the right to claim it or that you're stopped in some way from claiming the 2.3%. It's somewhere between a waiver and a stop or whatever. But address, you know, I think you really need to address that because it's really a question of whether a course of conduct can overcome the absence of a clear provision in an integrated contract. I mean, that's a little bit where we are. Well, that's one question. And another question is, what was the agreement? The district court made findings with respect to that. So you sort of have two hurdles to get by, it seems to me. Okay, let me attempt to clear them with the court. What was the agreement? The written integrated contract does not contain any limit on G&A. The district court went beyond that and reviewed parole evidence. But as we describe in our brief, the critical parole evidence it relied on was double hearsay, this inadmissible internal PAE email that it relied on to find that we had agreed to a 2.3% cap. And a point Judge King made earlier in bench trials, sometimes an application may be the rules of evidence or because the courts try a fact. But in this case, that became, A, there was never any foundation laid for this internal hearsay email. And that became the crux of the district court's finding that, and this is at JA 596, that's the only evidence that the district court said we agreed to this 2.3% rate in the proposal we submitted. So it was central to the analysis and it was admissible as we lay out. How many years was it? Judge Wilkinson mentioned you were paid a 2.3% for several years.  Yeah, the contract, Your Honor, has been ongoing and all option periods have been exercised and there's 16 option periods. This suit involved a narrower period of time because all of our years hadn't been audited. They basically did about, I think, 2,000. So how many years did you accept the 3.3%? Well, we didn't, Your Honor. You didn't accept it. We did not accept it. But you took it. How many years were you paid pursuant to the 2.3%? I believe all years PAE has paid a 2.3%. How many? How many years is that? The 16 years, Your Honors, of the extension periods. Some of that, again, is a little bit was in the future of this case, but I believe all 16 years. You didn't turn the money back. The parties disputed this. There were meetings. There were letters back and forth. We billed at a higher rate, Judge Wilkinson, so we didn't waive or accept 2.3%. Did you write back to them and say, We're taking this money but we're reserving our right to collect the rest? There was disputes in meetings and emails back and forth about this, and it came up years over years. But the key part is, again, to go back, and this I think really ties it up with the statute of limitations, is that there are two obligations PAE had under this contract, to pay our provisional rates that we billed and to pay our actual rates as audited by the government. And it was those actual rates for years 2004 to 2012 that were determined by the government in 2015, and we brought this suit well within the statute after they refused. We did. When we got our actual rates, we said, Pay us. But sort of that blends into what the district court did when it made factual findings about, and it found that in fact this contract was unclear and had been amended by parole evidence that it relied on. You say that parole evidence, some of it anyway, is hearsay. I'm not sure why it's not a statement against interest by your client. Well, Your Honor, and if I may address that, the key piece that I'm referring to just for the court is that's found at JA 955. And Judge Motz, what you may have been referring to, the first, there's two e-mails in this chain. And the bottom e-mail, the first in time e-mail, is from Mike Jarvis, who was a Flora predecessor employee, to Mr. Ward, who's PAE. And of course, Judge Motz, that e-mail could be a statement by a partner. But that's not an e-mail. That e-mail contains nothing about an agreement to a G&A rate. In fact, it says we're unable to support the G&A rate you've requested. Right. And there's subsequent e-mails. Which is between two PAE employees, Your Honor. Yeah. The top one, Jay Ward, PAE, Carol Simpson, PAE. Nobody from Flora on that e-mail. And this is the e-mail that he relied on internal to PAE that says – That accepts this. And that is hearsay. There was no foundation laid. It's not a present sense impression or business record as we describe it. Of course, you have to establish that it wasn't because it's an evidentiary ruling by abuse of discretion. Right? That's correct, Your Honor. But there was no actual discretion used. He just allowed it with no foundation or argument. But I would like to reserve the remainder of my time for rebuttal. All right. Thank you. Let's hear from the other side here. Mr. Mosher, pleased to hear from you. Thank you. Good morning, Your Honors. May it please the Court. Mark Mosher on behalf of PAE. I'd like to start with where Judge Wilkinson started this argument, and this is the question of how common is this sort of cap? Do parties regularly cap the G&A costs? And in 2000, FLOR said to the government, it said to the government, and this is at JA-976, that all of FLOR's contracts essentially have ceilings on G&A application. And our actual G&A rate far exceeds those ceilings. So this is very standard practice in the industry. And here what we have is a contract, a subcontract that expressly references a proposal. Again, that's common within government contracting in a contract between a prime and a sub when you had the proposal process, when you then sit down and reduce those terms to an enforceable contract to incorporate by reference the proposal. And so the judge here, he looked at the term proposal and he said, I can't tell based on the four corners of the contract which proposal is being incorporated because there are multiple versions. And so then he looked to the parole evidence and he determined that what the parties were incorporating was a proposal that included a 2.3% cap. There was discussion of this April email earlier, and I'm happy to address that. But first I'd like to turn the court's attention to the contract negotiations that occurred in September 2010. These were the negotiations of the subcontract. And what I think is one of the critical documents is at JA676, this is FLORS President Bob Jarvis. He sits down and creates a spreadsheet of what he calculates is going to be the projected costs for the life of the contract. And for every year he calculated FLORS costs using a fixed 2.3% G&A rate. He sent this chart to PAE. And when he did, his cover email said that he calculated these costs based on the prices previously agreed to including the G&A reduction. In a sense, if you're having difficulty in deciding what the proposal is or which proposal is supposedly incorporated by reference, and you say, well, this is the practice and everything, but why was there any impediment to the parties just sitting down and negotiating out a 2.3% cap? That would have made everything much simpler. But the point is it's not in the contract itself, the 2.3% cap. And it's an integrated contract. And one of the things we want is, and I think Virginia law wants, is be clear. And here we have an incorporation by reference argument, and we're having to take parole evidence on what exactly is incorporated and what exactly the proposal. Most incorporation by reference cases I've seen, you're at least clear as to what's being incorporated. And here we didn't even know. And we talk about summaries and spreadsheets and everything, but there was a simple way to avoid all of this. And you were the drafter of the contract. And we construe contracting language or contracts in the case of unclear against the party that drafted it. And you were the party that drafted it. And if you wanted to limit your expenditures or your reimbursement to a floor to 2.3%, why not just say so? Let me start and work backwards. First on this point that PAE was the drafter of the contract, the evidence shows that both parties drafted the contract. One of the key provisions of the contract is that chart of costs in subsection A1, that was drafted by floor. And so, you know, that argument is only raised in a brief note. I would say it's not properly before the court that this construe against the drafter. But even stepping back further, we would take the position that the cost, the cap is in the subcontract because when a document is incorporated by reference, that becomes part of the contract. If it's incorporated, but why was there so much dispute about what was even incorporated or what the parties intended to incorporate? There's dispute today, 15 years after the fact, and I hope to get to the statute of limitations issue. I would say there wasn't dispute at the time the contract was being negotiated. This is a situation where the chart of costs was drafted by floor, PAE agreed to it, and put it into the contract. So the parties understood at the time, and this relates also to the ascertainability point Your Honor made earlier. The key difference between ambiguity and ascertainability for purposes of is determined based on the four corners of the contract. But the Virginia cases and the law makes clear that when you're trying to determine whether a document is incorporated by reference, you can look to the negotiation history, the parties' discussion. The two cases the parties both rely on, the Hertz case and the central telephone case, in both cases, the parties looked to negotiation of the contract, to the parties' discussions, and I believe it was in the central telephone case, even to the parties' post-contract conduct to reflect their understanding of what the agreement is. So the judge was perfectly within his rights to look. Is it perfectly clear that all of the schedules of payments and everything that was incorporated actually incorporated a 2.3% cap? Yeah, the chart that's in subsection A1, the evidence shows that is a chart that was drafted by FLOR, and the evidence shows how that was drafted. The column of estimated costs is the estimate of the combined labor costs and the G&A rates. The cost is estimated because the labor had to be estimated. But the chart is clear as what FLOR did was to estimate how much they thought they would spend on labor. Obviously, that has to be an estimate because they don't know how many employees, at what rates, you know, we're projecting 15 years. So they estimate labor, and for every year, they then multiplied it by 2.3%, used that number as the G&A rate, added them together to put in the contract as the estimated cost. If they didn't think— Sorry, I didn't mean to interrupt you. I just wanted to make the point that that 2.3% cap, they suggest, well, maybe that's just provisional. That's not really, you know, what we thought we were entitled to. But we knew, and then they said that what their projection of their actual costs were, were 7%. So if they thought that the contract entitled them to their actual G&A, they would have used 7% there. Did they object to the 2.3% payments? They began objecting in year two of the contract, so 2004, about 12 years before the lawsuit began, which I think is a good segue to the statute of limitations. Go ahead. You were in the midst of this contract on 677, or this chart on 677. First of all, who put this together? That was drafted by FLORS President Bob Jarvis. Okay, now does this—can you help me understand what this is? Sure. I thought that you were relying on this. Does this plug in the 2.3%? Does it have anything to do with that? If it doesn't, I thought that that was relevant to your response to Judge Wilkinson. Yeah, absolutely. And it was helping me understand whether it was there or not. So this is—the other side comes up with this document. Right, and so you see direct labor, which is estimated for each of the 15, 16 years. This is what you were talking about, direct labor. Yes, that G&A, you've got to—I'm not going to be able to do the math very well on the fly, but it is if you calculate them all out. That's 2.3% for each year. The G&A is 2.2% of the first thing. The first thing, right. Direct labor is estimated. G&A is strictly mathematical calculation, column A, direct labor, times 2.3%. That gives us our G&A. Total cost, then, is direct labor plus G&A. This, then, column of total cost is what we see in the subcontract as the estimated cost, and that was the number prepared by floor. There's testimony from the employee at PAE who worked on the contract, and she said when she received the spreadsheet, she looked at it, went down and calculated, ensured that the G&A was at 2.3%. That showed her that floor understood they were getting 2.3%, and because PAE agreed that these were the right numbers, they put this directly in the contract. So, at a minimum, this also goes back to the ascertainability point. We don't know of any case, and it's hard to imagine, a situation where there is a proposal or an agreement outside the contract where the parties could sit down and create a summary document and they could agree that this is a summary that accurately reflects the proposal, and that they could reach that sort of agreement, but yet at the same time, they didn't have sufficient clarity to incorporate it into the document. It seemed especially, you know, ultimately, we think the ascertainability issue would, you know, become a question of fact, which the district court, I mean, at a minimum, we could say that it made the finding. This wasn't really, you know, I've addressed this on the merits, but it wasn't an argument really that was made below that no proposal was incorporated into the contract. Floor presented at trial a different proposal, a proposal that still had their 7.0% that they wanted to do, but we think that's a very different argument than saying. And just so I'm clear, luckily I don't have to do too many times with these kinds of contracts, but it puts it out for 15 years, is that what the time is on the left? Yes. It's giving you the first year and then it gives you the 15th year at the end, is that right? Yes. Okay. Now, we give what kind of deference to the findings of fact made by the district court. It's clearly erroneous, Your Honor. That is, we affirm, unless they're clearly erroneous. That's the standard review, is that you affirm the factual findings. There wasn't any impediment to your, including a provision of pushing, negotiating for a 2.3% cap, which was a lot, should have been a lot clearer than a table with estimates. I mean, there wasn't any impediment to your, just including in the contract itself, a 2% cap on floors, G&A costs. I thought this whole document was incorporated. I thought you told us that. This was the, so there is a chart in the contract, in the subcontract. I'm sorry, when we're looking at 677, it's not part of the subcontract. No, I understand that. I thought these figures that were in the, go ahead. I didn't mean to talk over you, Your Honor. I didn't mean to talk over you. The last few columns, total cost, award fee, contract value, those are the figures that were placed into the chart that's in subsection A1. Of the contract. Page 12 of the judge's opinion, paragraph 18. He says the proposal referenced in sections A1 and B2 of the subcontract is the document labeled, and then he quotes trend, all this stuff, G&A rate of 2.3%. Is that the one you're talking about? No, this chart I'm talking about? The proposal. Right. Defendant's Exhibit 5. Right. That is the one you're talking about or not the one you're talking about? That's not the document I'm talking about right now. All right. So which one is you deriving a 2.3% from? He says that's prepared by Jarvis. Right. So you've got the proposal that was submitted in April. You had the original proposal that came from Floor, which is what they put forward to the judge as the version that was incorporated into the agreement. What the judge found, as a factual matter, is it was that document, but it had been modified to include the 2.3%. That was the proposal. This is a document that arose in September 30, 2002, in the context of contract negotiations. So when the subcontract was originally. Let me, you know, because the argument indicates some of the confusion that the parties had about what exactly was incorporated. I want to know whether there's any reason or there was any. Yeah, whether there was any reason that you could not put a cap on what you, a 2.3% of direct cost cap on what you owed to Floor. Why not do it that way rather than having a table with estimates and this and that and all the rest? You know, was there any reason you couldn't make it clear? I mean, certainly it would be better for our client's perspective if the contract was unambiguously clear in our favor. But that doesn't mean that what the district judge did was incorrect. He concluded that it was ambiguous. He then looked to the parole evidence. And critically, you know, when I get back to it, there were two times during the contract negotiations where Floor said, we have previously agreed to a G&A reduction. I mean, I think those two pieces of evidence are enough to show that the factual finding, that the proposal included a cap, would not have been clearly erroneous. What actual finding do you need to ask the predicate question of why in an integrated contract there wasn't a straightforward expression of a 2.3% of direct cost cap on what you owed Floor? It would seem to me that it would have been in your interest to have put a straightforward limitation on G&A reimbursement. It would seem to me that it would have been greatly in your interest to just have that little provision in there. But it's not in there. And as a result, we've had to go through this long trial with parole evidence and everything. And at the end of the day, can someone say, we're adding a term to the contract in your favor that you didn't win at the negotiating table? That's the question. I think both sides have some hard questions to answer. Well, that is the question. And I think that's right. This contract isn't crystal clear. And you're not maintaining, I don't think, before us that it was. The district court didn't find it was in any event. And so you say, look at this and look at that. And that's what we have to decide, whether the district court was clearly erroneous in its analysis here. Doing it this way was good for the lawyers. Looks to me like. But so I think you said just a few minutes ago that one of Floor's higher-ups, the president, or somebody said, well, we agreed to the 2.3, but we're not happy with it now, or something like that. Are there statements like that? My misremembering. There are multiple. Yes, there are. So is that by Jarvis? There are. Yes. So Bob Jarvis. He's the president. He was the president. And so what does he say? Because I haven't characterized him quite right, I'm sure. Okay. So certainly there were statements by year two of the agreement when they wanted to renegotiate. And the parties did negotiate. So there's no allegation. Part of the agreement early on was we'll take the reduced cap if we can try to work something out. Right. Parties did sit down, try to work something out. There was an agreement. It wasn't everything that Floor wanted. But there was an agreement. But to get back to your specific question, one of the arguments that they made during negotiations on the subcontract is they said, because we've taken a lower G&A, we want a higher potential award fee. So this is because we took the 2.3, we want a higher? Okay. And you had negotiations about that, and they did get some higher? At that time for the overall award fee pool, no. At that time when they were negotiating, PAE said we couldn't do that. And ultimately that's just a standard to go back and forth in contract negotiations. Right. They had the opportunity to say, well, we're not signing until you put it in, and they didn't. They signed the agreement as written. But then additional disputes started arising in year two, and I see I have a minute left. So I do want to touch briefly on the statute of limitations. We do think the court can reach it. Obviously the court wouldn't have to. It's the discretion. But I think the arguments this morning show that the real dispute here comes down to a question of law, and it's this interpretation of the federal regulation, 52-216-7, and what sort of obligation arose after the audit. And what the federal regulations say is that when you bill at the time of performance, you're billing your final anticipated rate. So at that time they needed to bill the amount they thought they were owed. And that's why this dispute arose in 2004, because if they were right on their interpretation of the contract, they should have been receiving their actual rates back in 2004. The only post-audit obligation that could even potentially arise is an obligation to make an adjustment. And that could actually go either way. If the audit shows that they were overpaid, then PAE would add a claim against floor to get the extra. If the audit shows it reduces it, it works the other way. If the audit doesn't change the amounts, no one has any cause of action for anything. And so that's why we say that this breach, if it occurred, occurred in 2004. The facts on that aren't in dispute, really, because it's undisputed. They submitted a payment. They submitted an invoice for payment above 2.3%. In 2004, we refused it on the ground that the contract contained the cap. They waited 12 years to bring a suit based on that breach of contract. How many years would be knocked out? What's that? How many years would be knocked out on the statute of limitations? It's a five-year statute of limitations. You say it's a five-year statute of limitations. Right. So it would knock out seven years or something? Yeah, at least. So then the question would be whether. It's hard to figure that out on how many years. I'm just saying it's hard to figure. So how many years would be knocked out? It started in 2004. How many years would be knocked out of the thing? Yeah, certainly 2004 to 2011. 2011. Seven years or eight years, seven years would go. Is that right? Well, is that your position? At a minimum. Our position is that it can knock out the entire thing because it's a single breach. Because it's a single continuous breach. All right. You're right. Thank you, Your Honor. Thank you. Mr. Hatch, it seems to me that both of these positions here have a good deal of weakness to them. He's warning us to make a gift of a provision to the contract that really wasn't there, at least in clear terms. He's warning something that could have been straightforwardly expressed and wasn't. But on your side of the thing, it seems like your client was asleep at the switch for a long time. And I don't know what you're thinking of if you really felt like there was no cap on what you would do. Why were you accepting this lower payment for so many years? Why weren't you protesting? Why weren't you seeking some kind of recourse earlier? Why were you agreeing to summary tables that could be construed as imposing a 2.3% cap? In other words, there's a long period here where your client just seems to be asleep if you really feel like you've been injured. Now, what explains this comatose sort of period? To answer your question, Judge Wilkinson, of course, the contract we agreed to did not include that rate. And that's so critical because all that pre-contractual negotiation is easily explained. As my fellow counsel said, we had conditional offers and counteroffers, and that didn't get agreed to as to the rate. And you know that because it doesn't show up in the contract. Now, let me take it after the contract and to your question about whether we were asleep at the wheel. At JA845, this issue came up. The base year was a 2.3%. We worked under that for the base year. And I misspoke. Excuse me. I said 16 years earlier. It's 13 years of performance. Let me correct that. But the base year, there was not much dispute. But then the parties began disputing this issue for going out and continued to dispute it. And then JA845, in a post-award subcontractor meeting, this is PAE, in a post-award subcontractor meeting, they say the 2.3% G&A rate was only accepted for the base year, first year, and G&A rates in the out years, all those extensions, was open to negotiation. Then we have, I direct you, because I can't unpack it all in the short time I have left, but our opening brief at 53 to 54 has additional JA sites that are going to show that continuing dispute between the parties. We continued to bill to Mr. Bowser's point about, well, they had to bill at what they expected. We billed at a higher rate. They didn't pay it, but we did bill at the higher rate, and ultimately we got our rates audited, and they were higher. And the last thing I would say on this is that at JA594 footnote 3, this is the district court's memorandum of opinion. After trial, he has a footnote, Judge Trenga, it said, from 2004 through the filing of this action, the parties continued to review and discuss the G&A rate dispute. And he was talking about that in the context. He didn't give a lot of that a lot of weight because it was post-contractual disputes, but I just mention it to this court because I think that summarizes at a high level that Judge Trenga appreciated. This was a subject of hot dispute. And the last point is that why we didn't have to press it. He says the people who were negotiating weren't personally involved, and that he wasn't going to give only little weight for what they had to say. Right, right. Because these are all, but I am using it for the point about just at a high level that there was ongoing dispute, as he recognized for all those out years. I don't have time to summarize it all today, but I think the district judge who heard the evidence did recognize that. So now we're supposed to credit what he concludes, right? We're not saying all of his findings were clearly erroneous, to be fair. We have concerns with the central ones, but yes. My basic point is a point of loss. But, Judge, to round out my answer to your question, these parties, of course, are in an ongoing relationship by virtue of prime and subcontractor role. They're working alongside on this contract. Yes, we have this dispute, but ultimately this dispute relates to the provisional rate we're billing. And from my client floor, you know you get your indirect actual rates once the government does the audit. I know it's strange that it takes years to do it later, but that's just how the government works. But you're saying that he shouldn't have taken one piece of parole evidence? That's correct, Your Honor. The reference to the proposal in the contract, which occurs twice in A1 and B2, are references to the type of services and labor that would be provided, not an issue in this case. Do you think this is a clean question of law that could have been resolved without taking any parole evidence and that Virginia law has a preference for approaching contracts that way? I believe it's the strongest state on avoiding parole evidence. Yes, Your Honor. So it's a clear the contract did not call for reaching the proposal as to any kind of cost cap. There is the table in the contract that has a total value, which we're not exceeding, and has estimated costs. The proposal isn't referenced for purposes of capital costs. But it incorporates it based on that earlier chart. It is. The figures match. In the estimated cost category, which, again, I can't say it any better than estimated costs, that we don't dispute the district court found that there was a 2.3% rate that was used that led up to that. But, again, this is in the context of estimated costs, and there's no dispute. You have to bill at some rate. Well, the part that was estimated was what they were going to pay for the labor. The 2.3% wasn't estimated. It was applied to that figure each time. It was used to calculate what the estimated cost would be. And we don't seek to exceed the right-hand column, the not to exceed value. That is a limit on the recovery. We nowhere seek to exceed that in this litigation. That is a limit. The parties expressed it. They expressed none of this other stuff because they didn't agree to it in their integrated contract. Even if you try to look at the proposal, it's not for this purpose, and there's no ascertainable G&A cap if you even try. Thank you. We thank you. We will adjourn court and come down in Greek Council. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: J. Harvie Wilkinson III, Diana Gribbon Motz, Robert B. King